UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| FUNDS SEIZED FROM THREE BANK | ) | |
| OF AMERICA ACCOUNTS: (1) | ) | |
| $855,984.04 SEIZED FROM ACCOUNT | ) | |
| XXXXXXXX7515, IN THE NAME OF AZ | ) | |
| LABS LIMITED; (2) $1,915,749.60 | ) | |
| SEIZED FROM ACCOUNT NUMBER | ) | |
| XXXXXXXX7390, IN THE NAME OF SB | ) | |
| RETAIL LLC; AND (3) $594,106.60 | ) | |
| SEIZED FROM ACCOUNT NUMBER | ) | |
| XXXXXXXX2869, IN THE NAME OF | ) | |
| SYED RAZVI | ) | |

Defendant.

**VERIFIED COMPLAINT FOR FORFEITURE**

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant property, alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

**Nature of the Action**

1.     This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2.      This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3.      This complaint is verified by the attached Verification of Ellen Diamond, Federal Bureau of Investigation ("FBI") Special Agent ("SA Diamond"), which is fully incorporated herein.

## The Defendant *in rem*

4.      The defendant *in rem* consists of the following property:

> (a) Funds seized from three Bank of America accounts: (1) $855,984.04 seized from account xxxxxxxx7515, in the name of AZ Labs Limited (**Subject Account 1**); (2) $1,915,749.60 seized from account number xxxxxxxx7390, in the name of SB Retail LLC (**Subject Account 2**); and (3) $594,106.60 seized from account number xxxxxxxx2869, in the name of Syed Razvi (**Subject Account 3**).

Collectively, the "Subject Accounts."

5.      The defendant property was seized on or about January 5, 2024.

6.      The defendant property is currently in the custody of the United States Marshals Service.

## Jurisdiction and Venue

7.      This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

8.     This Court has *in rem* jurisdiction over the defendant property pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because acts giving rise to this action occurred within the Northern District of Illinois.

9.     Venue is proper in the Northern District of Illinois pursuant to Title 28, United States Code, Section 1395(b)(1)(A) because acts giving rise to this action occurred in this district.

## Statutory Basis for Forfeiture

10.    The defendant property is subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957, or any property traceable to such property.  The defendant property is further subject to forfeit pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) as property that constitutes and is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343, and 1347.

## Specific Allegations

I.     **Background**

A.     **AZ Labs Limited**

11.    According to information provided by the Illinois Secretary of State, AZ Labs Limited ("AZ Labs") was incorporated on or about October 26, 2021, by Syed Razvi.  According to the Illinois Secretary of State's website, on or about February 14, 2023, AZ Labs' registered agent was changed to Bhaskar Shankar, and Shankar is identified in IL SOS records as its President.

3

12. According to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), AZ Labs is a registered provider with Medicare. Syed Razvi is listed as the "Authorized Official," "Contracted Managing Employee," and "5% or Greater Direct/Indirect Owner." As part of PECOS, there is an electronic funds transfer ("EFT") agreement between Medicare and AZ Labs. According to the EFT agreement, Medicare monies for claim reimbursement to AZ Labs were to be electronically deposited into **Subject Account 1** beginning on or about April 30, 2022.

13. On or about February 15, 2023, according to Bank of America records, the signatory for **Subject Account 1** was changed from Syed Razvi to Bhaskar Shankar.

**B.    Medicare Program**

14. Medicare is a federal health benefit program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services. Medicare is funded through individual payroll taxes, other taxes, and user fees. Medicare helps pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

15. Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare

4

seeking reimbursement for covered benefits, items, and services.

16. Medicare, as well as private health care benefit programs are "health care benefit programs" as defined by Title 18, United States Code, Section 24(b), that is, a "public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual…" 18 U.S.C. § 24(b).

17. Medical providers and suppliers must obtain a National Provider Identifier ("NPI") before enrolling in Medicare. Health care providers seeking to become a Medicare provider must submit enrollment documentation to Medicare, which includes, among other things, contact information for the provider.

18. Every claim submitted by, or on behalf of, a physician or health care provider, includes an agreement by the provider to abide by Medicare's rules and regulations. As a condition of payment Medicare requires providers to certify all information on the claim is true, correct, and complete. Additionally, the provider certifies the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care and that the service was medically necessary for the health and/or well-being of the patient. Health care suppliers, like AZ Labs, are paid by Medicare through the submission of claims. All Medicare providers are required to submit claims electronically. Those claims are processed through Baltimore, Maryland, and therefore they travel in interstate commerce. Medicare reimburses claims electronically, as well, and payments for Medicare Part A services in Illinois are issued from National Government Services, a Medicare Administrative Contractor headquartered in Indianapolis, Indiana. Payments are

made into a provider's bank account through an electronic funds transfer.  Providers are also required to maintain all documents that substantiate Medicare claims for at least six years.

19.    A review of the Provider Enrollment Chain/Ownership System ("PECOS") revealed that until July 13, 2023, AZ Labs was actively enrolled with Medicare.  Therefore, at all relevant times to the claims and billing described below, AZ Labs was bound by the laws, rules, and regulations that govern Medicare.

20.    As of July 13, 2023, Medicare revoked AZ Labs ability to participate in the Medicare program and placed them on a three-year suspension from the program.

**C.    Over the Counter ("OTC") COVID-19 Test Kits**

21.    In April 2022, the federal government announced that individuals with Medicare could receive up to eight OTC COVID-19 tests per calendar month from participating pharmacies and health care providers for the duration of the COVID-19 public health emergency ("PHE") at no cost to beneficiaries. The PHE ended on May 11, 2023, at which point Medicare would no longer pay for eight OTC COVID-19 tests per month at no cost to beneficiaries.  However, on February 9, 2023, Medicare announced that it is allowing a one-year grace period for providers to bill OTC COVID-19 tests that were provided to beneficiaries prior to May 11, 2023, but that the provider was unable to bill prior to May 11, 2023, deadline.

22.    To receive reimbursement from Medicare for the OTC COVID-19 tests, providers were directed to bill Medicare using Healthcare Common Procedure Code System ("HCPCS") code K1034.  CMS's guidance to providers billing for these OTC

COVID-19 tests is to "only give patients the tests when they request them." Additionally, CMS instructed providers to "Keep good documentation. We may ask to see documentation showing a patients' request for tests. If you don't provide the documentation, we could recoup payment and may take other administrative actions."[1]

## II.     Facts Establishing Basis for Forfeiture

23.    The Federal Bureau of Investigation (FBI) and the United States Department of Health and Human Service, Office of Inspector General (HHS-OIG) are investigating allegation that AZ Labs has, from approximately March 31, 2023, to the present, fraudulently obtained government funds through the Medicare program.

24.    The investigation has revealed that AZ Labs (1) submitted claims via interstate wire transmissions for reimbursement through Medicare for OTC COVID-19 tests purportedly provided to patients who never received the OTC COVID-19 tests, as well as to Medicare beneficiaries who were deceased, and (2) submitted claims to Medicare for patients who did not agree to or approved the delivery of OTC COVID-19 tests to their home.

25.    According to Medicare data, AZ Labs billed Medicare almost exclusively for HCPCS Code K1034. Medicare defines HCPCS Code K1034 as: Provision of COVID-19 test, nonprescription self-administered and self-collected use, FDA approved, authorized, or cleared.  Based on witness interviews, many of these OTC

---

[1] https://www.cms.gov/COVIDOTCtestsProvider. The website was last modified on 01/18/2024.

COVID-19 test kits that were billed to Medicare were never delivered to Medicare beneficiaries.

26.     In summary, according to witnesses and records obtained by law enforcement, AZ Labs listed a practice location in Chicago, Illinois, in a business suite in the building at 4801 W. Peterson Avenue.  AZ Labs improperly billed Medicare for OTC COVID-19 test kits through various means, including (1) charging Medicare for OTC COVID-19 test kits that were never provided to Medicare beneficiaries; and (2) charging Medicare for OTC COVID-19 test kits that were delivered to Medicare beneficiaries that did not consent to, or agree, to receipt of the items.

### A.     Beneficiary Complaints and Interviews

27.     Beginning in April 2023, Medicare began receiving calls from Medicare beneficiaries to Medicare's complaint telephone number, 1-800-Medicare.  The number dials to a call center where Medicare-contracted employees intake complaints from the public regarding any Medicare-related issue including Medicare fraud, waste and abuse or quality of care issues.

28.     Between April 6, 2023, and December 11, 2023, Medicare received approximately 9,492 beneficiary complaints listing AZ Labs as the subject of the complaint.  The complaints came from approximately 9,215 beneficiaries.

29.     Of the 9,492 complaints, 4,200 of those complaints are categorized as reporting the Medicare beneficiary "Did Not Receive Services" from AZ Labs.  262 of the complaints have been categorized "Suspected Identity Theft."

30.     Law enforcement agents have begun to interview Medicare beneficiaries

who have lodged complaints relating to AZ Labs.

31.     For example, between approximately June 5, 2023, and December 15, 2023, law enforcement agents interviewed 5 individuals who reported that AZ Labs had billed Medicare using his/her name for shipment of OTC COVID-19 test kits that were purportedly delivered to them.  All 5 individuals reported to the interviewing agent that they had never received or requested a COVID-19 test kit from AZ Labs.

**B.     Billing Medicare for Deceased Beneficiaries**

32.     An analysis of AZ Labs' billing records by Medicare indicated that from April 3, 2023, through June 7, 2023, AZ Labs attempted to bill Medicare for services purportedly provided to approximately 161 deceased beneficiaries.  In other words, the date of service according to the claim submitted by AZ Labs, the purported date the test kits were sent or delivered, occurred after the reported death of the Medicare beneficiary.  The following are examples of individuals with dates of service after their death whose claims were billed to Medicare by AZ Labs:

| Beneficiary | Purported Date of Service | Date of Death | Amount Billed |
|---|---|---|---|
| V.L. | 03/21/2023 | 06/18/2019 | $96.00 |
| S.L. | 03/21/2023 | 09/15/2019 | $96.00 |
| J.L. | 03/21/2023 | 10/25/2019 | $96.00 |
| L.L. | 03/21/2023 | 12/17/2019 | $96.00 |
| D.L. | 03/21/2023 | 03/09/2020 | $96.00 |

33.     In total, AZ Labs attempted to bill Medicare approximately $15,456 for 161 claims for purportedly supplying OTC COVID-19 test kits, after a beneficiary's date of death.  Medicare did not pay AZ Labs any money, as the Medicare system

identified all individuals whose date of death – according to Medicare's records – preceded the purported date of service and denied the claims.

34. Medicare providers who repeatedly bill for services purportedly provided to dead beneficiaries often are using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of their provisions of bona fide medical services to beneficiaries.

**C.    Medicare Claims Analysis**

35. Medicare claims data for the week of June 20, 2023, indicates that from approximately October 26, 2021, the date of incorporation, until March 31, 2023, AZ Labs did not bill Medicare for the shipment of any OTC COVID-19 test kits under HCPCS Code K1034.

36. Based on a review of Medicare billing data, from March 31, 2023, until June 12, 2023, AZ Labs billed Medicare approximately $13,039,584 under HCPCS Code K1034 and was paid approximately $12,226,449. During this period, AZ Labs billed Medicare for the shipment of 133,746 OTC COVID-19 test kits for different Medicare beneficiaries for a total of 135,829 claims.

37. According to the data submitted by AZ Labs in connection with this billing, the dates of service – that is, the date on which the OTC COVID-19 test kits were purportedly shipped or received – occurred between approximately March 2, 2023, and May 6, 2023.

38. On seven days alone, April 17, 2023, April 21, 2023, April 27, 2023, May 5, 2023, May 8, 2023, May 11, 2023, and May 22, 2023, AZ Labs billed Medicare $11,

835,742 and was paid $11,120,163, which was approximately 91% of the total amount billed and paid for OTC COVID-19 test kits from Medicare.

39.     AZ Labs billed Medicare for the OTC COVID-19 test kits, and reimbursements were deposited into AZ Labs' bank account, **Subject Account 1**. According to information provided by Medicare, as of June 13, 2023, Medicare paid approximately $12,226,449 to AZ Labs through **Subject Account 1**.

### D.     Review of Financial Records

40.     On or about December 6, 2023, law enforcement received a portion of Bank of America records for **Subject Account 1**, held in the name of "AZ Labs Limited." **Subject Account 1** was opened on or about December 23, 2021, by Syed Razvi, who was also the signatory on the account.  On or about February 15, 2023, the signatory on the account was changed to Bhaskar Murthy Shankar. Shortly after that date, AZ Labs began billing Medicare more than $13 million under HCPCS CODE K1034.

41.     According to Bank of America records, between on or about April 1, 2023, and June 30, 2023, Bank of America received deposit of approximately $14,323,931 into **Subject Account 1.**

42.     Of that amount, approximately $12,226,449 were remittances from Medicare.  That amount represents 85% of total deposits received by **Subject Account 1** during that period.

43.     Based upon review of bank records for the **Subject Accounts,** there is no indication that AZ Labs had business expenses during and in the months

11

preceding the purported provision of services that one would expect for a company that delivered more than a million OTC COVID-19 test kits to more than a hundred-thousand Medicare beneficiaries between approximately March 2 and May 6, 2023.

44.     More specifically, there is no evidence of payment for the regular and sizeable expenses that one would expect for a business operating as a large-scale provider of OTC COVID-19 test kits to Medicare beneficiaries, such as for payroll (or to a payroll service provider); for OTC COVID-19 test kits; for shipping, postage or packaging to mail OTC COVID-19 test kits; or payments to Medicare billers, from the **Subject Accounts**.

45.     Analysis of bank records obtained from Bank of America for **Subject Account 1** showed transfers of approximately $11,151,335 to **Subject Account 2** between April 18, 2023, and June 8, 2023, the largest of which, a round-dollar transfer of $4,000,000, occurred on June 8, 2023.

46.     The name on **Subject Account 2** is "SB Retail LLC" and the signatory on the account is Bhaskar Shankar. Shankar is the same signatory substituted in Bank of America's record for **Subject Account 1** shortly before AZ Labs began fraudulently billing Medicare for the purported delivery of OTC COVID-19 test kits. Much of these funds were subsequently transferred out of **Subject Account 2** in transactions that have no apparent connection to the purchase and sale of OTC COVID-19 test kits.

47.     Financial record also shows that between April 15, 2023, and May 15, 2023, AZ Labs made 3 large round-dollar transfers of funds from **Subject Account**

**1** to **Subject Account 3,** for $75,000, $200,000, and $372,000 ($647,000 in total). The name on **Subject Account 3** is Syed Razvi, which Bank of America records indicate he is the signatory on the account. The transfers have no apparent business purpose that is discernible from the records.

48. The **Subject Accounts** were frozen by Bank of America on or about June 13, 2023, and funds totaling approximately $3,365,840.24 remained on deposit in the accounts as follows: **Subject Account 1** ($855,984.04), **Subject Account 2** (1,195,749.60), and **Subject Account 3** ($594,106.60).

49. Travel records indicate that Bhaskar Shankar left the United States on June 29, 2023, from Los Angeles, California on a commercial airline flight to Doha, Qatar. Shankar does not appear to have returned to the United States since that time.

## Conclusion

50. For the reasons stated herein and in the attached affidavit, incorporated by reference herein, the foregoing defendant property was involved in a transaction or attempted transaction in violation of section 1957, or is property traceable to such property, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(A). Furthermore, the foregoing defendant property was derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343, and 1347, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(C).

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1)      That process issue for an arrest warrant *in rem* for the defendant property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2)      That due notice be given to all parties to appear and show cause why forfeiture of the defendant property to the United States in accordance with the claims herein set forth should not be decreed;

3)      That this Court enter a judgment of forfeiture for the defendant property to the United States; and

4)      That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney
Northern District of Illinois

By:     _/s/ Brian Hayes_____
BRIAN HAYES
Assistant United States Attorney
219 South Dearborn., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated:      April 2, 2024_____

14

NORTHERN DISTRIT OF ILLINOIS  )
                                     )     SS
COUNTY OF COOK               )

## AFFIDAVIT

I, Ellen Diamond, being duly sworn, upon oath, depose and state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2004. My duties and responsibilities as a Special Agent with FBI include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations of Title 18, United States Code 1343 (wire fraud), Title 18, United States Code 1347 (health care fraud), and Title 18, United States Code 1957 (money laundering). I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple federal search warrants and arrests.

2.     I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons, and documents, and it does not include each and every fact known to me concerning this investigation.

3.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _04/01/2024_

_Ellen S Diamond_
ELLEN DIAMOND, Special Agent
Federal Bureau of Investigation